Good morning. May it please the Court, I'm Suzanne Luban. I represent Mr. Macias-Valencia, and I'd like to reserve two minutes for rebuttal. Your Honors, this is solely a sentencing appeal. The first issue I'd like to address is the role. The district court is required under Booker and all the cases following to find the correct guidelines. And in this case, the district court denied, erroneously, the mitigating role. And also, I'll address secondly, the approximation of purity was also incorrectly decided by the district court. So as a result of those two errors, the resulting sentence was unreasonable, as well, in this case. So I'd like to talk about role first. Salvador, the brother, was the sole negotiator. When he met with the informant, he never had to get back to him, but while he checked with his boss, he was able to negotiate as to price. He hemmed and hawed numerous times about quantity, which relates to the quantity issue later. But he was always the person up front, making the deals, the time, the arrangement, the place, the dollar amount, and the quantity of drugs. Wasn't your client sort of the cooler? I'm sorry? Well, isn't he the one that sort of said, oh, this is not a sting. I've been in these stings before. That's correct. That's who he is. He's the guy who shows up at the end, and the guy says, oh, this is my brother. Often, that's called the lookout or the person who comes with the other person as, I don't like to use the word enforcer because my client's not armed, but just the safety in numbers, bringing another person along, who's clearly there, knows what's going on, and is a participant in the deal, but is not responsible for the money. Salvador pulls the money out of his pockets, so he's not the money man. He's not holding the money. He's not the decision maker. He is a minor participant attending the meeting and making conversation, which is arguably designed to make the guy feel more comfortable. More than conversational, isn't it? Well, the agent is asking him about his record, and he's asking him questions that he's responding to, and I'm sure that the idea is you have a record, I have a record, we are more comfortable with each other if we've all been busted by the cops, but the impact on the deal and the facilitation of the deal, my client's role is clearly less culpable, less substantial than his brother's. He didn't set up the deal. He's not the money man. He doesn't negotiate the terms. He's there, and he's participating in the conversations that lead people to feel comfortable, and when you weigh the roles against each other, there's only two defendants involved in the case, so you just have to compare the two brothers and their roles, and the preponderance of the evidence shows, I'm sorry, Your Honor. Judge Schroeder, do you want to? Well, you seem to be suggesting that if there are two people, then one is automatically entitled to a mitigating reduction, and I'm not just because one may not be as active a participant doesn't necessarily mean that he's entitled to mitigation, does it? Well, I may not have phrased that correctly, Your Honor. What I was getting at when I said the two defendants, that there would be only two people to compare, and if one is less culpable than the other, then to say, is his role substantially less culpable than the average defendant, or the average drug dealer, in a case like this, and in this situation where all terms Well, the two standards aren't the same. That one may be less active than the other doesn't mean that he's less active than the typical drug dealer who's there, who's trying to make sure that everything goes according to oil and goes smoothly. Your Honor, my client isn't necessary to the deal. He's not he doesn't bring the money. He's not negotiating the terms. He doesn't find the guy, you know, find the undercover cop, but the supplier. He is, you know, superfluous essentially, except that he's there to sort of grease the wheels, and he's culpable, but he's I would say the facts show just by preponderance of the evidence is all that had to be found that he was less culpable and that he should have, and by the way, the CI targeted Salvador. He never talks about Salvador and his brother. He says Salvador is a major dealer, a significant dealer. So he's the person who's known in the drug community there. I'd like to go to the quantity. There were no drugs seized here. The government, of course, was controlling the quantity and the quality if there were drugs produced because it's a reverse sting. In that kind of situation, Application Note 12, 2, 2D1.1 controls, and that to the extent that it's advisory, of course, but in this case, we're looking at the calculation under the guidelines. And so that Application Note says to look at similar transactions by the defendant, which we didn't have any similar transactions by these defendants because there were none that were made prior to the arrest. Financial records seized, which there were none. The size of a lab involved, which there was none. And the price, generally, for drugs, which we know that the price for a half a pound was $4,000, which is about what they had, and that would be of a 50% purity. So it doesn't say that you can consider quality generally in the community, which is what they did here. They took an average of dope sales that undercover officers had participated in and checked what the price was and the quality of the purity of those drugs. And that was an improper basis. And so instead of looking at noticing that there were no actual facts that they could compare based on these defendants, that what the court should have done then is just used the mandatory minimum, because there was no basis to find by preponderance of the evidence what the purity would have been. And as to the actual quantity, the actual intent controls a situation like this, because there were no drugs seized, and the actual intent and ability of these people as they showed up with this amount of money, which is just about exactly what it would have cost to buy a half a pound, which is what all along Salvador was saying he could really manage, but he was being, I think, persuaded that he should take more by the informant, by the undercover, that at the time of the buy, under these cases, the actual intent controls, and he only had the ability to buy a half a pound. Even though there was an agreement to buy a pound? That's correct. The actual ability supersedes the agreement, but the intent at the time of the buy. Okay. Thank you. Good morning. May it please the Court. My name is Lori Gray. I represent the United States. Defendant challenges two sentencing findings on appeal. Because neither of those was clearly erroneous, this Court should affirm the sentence. I'd like to start in reverse order with what the Defendant brought up, and that first would be the calculation, because I imagine that's what the Court's most interested in. With regard to the calculation, I disagree with Defendant in that you look at the actual intent. The guideline, Application Note 12, starts out by saying, If an offense involved an agreement to sell a controlled substance, the agreed-upon quantity of the controlled substance shall be used to determine the offense level. Now, there's an exception, but first let's look at what the agreed-upon quantity is. And it's clear, looking at the transcripts in this case, that the agreed-upon quantity was one pound. And the Defendant concedes that in their opening brief. They go through repeatedly that this was a one-pound amount. Now, the exception to going with that agreed-upon quantity, and that's the exception the Defendant argues, and it's his burden to establish, is that he was not reasonably capable of purchasing the agreed-upon quantity. If that's the case, then the Court is to exclude the amount he could not purchase. In that regard, what do we make of Agent Alvarez's affidavits that states that the DEA agents believe they were only intended to purchase one-half pound? Your Honor, I would submit that we ignore that? You don't ignore it, but it's one factor to consider. And what I would ask the Court to look at, this is a conspiracy. The conspiracy was the agreement for one pound. And as the Court noted, it said, and the agent indicated that he felt he was only Your Honor, says that does not mean that the conspiracy or the agreement was not to sell one or possibly two pounds, but merely on that particular meeting, the Defendant did not bring enough money to pay for a full pound, as he indicated. So any time any person involved in a drug transaction talks about a larger amount, but where it's clear, at least in the agent's mind, that they intend to purchase a lesser amount, it's okay for the district court to go immediately to the larger amount? I wouldn't say any time, Your Honor. I'd say on the facts of this case, based on the negotiations, that it was for one pound. And when the Defendant turns up at the scene, he doesn't try to change the agreement. He doesn't say, hey, wait a minute, we don't have enough cash, or you know what we'd like to do is just give you the cash we have, sell it, and come back for more. There's none of that. And, in fact, as the Court says, the agreement didn't change, it was one pound. And the Court goes on to say, we could speculate all day as to various reasons that he didn't have the money with him. Again, the Court at Excerpt of Record 56 says, one speculation would be that since nothing was said when the money was taken out, that the Defendant's intended to hoodwink the seller. And that, Your Honors, I would submit based on, could be argued based on the wad of money that the Defendant produced. The deal was for one pound of high-quality crystal meth for $4,689 or, excuse me, for $7,000. He turns up with $4,689, and most of that's 20s. He's got $120 bills. He's got a whole wad of cash that he didn't need. So the first thing is the Court said, well, you know, we can speculate why he didn't have enough. It could have been that he was going to hoodwink him. The Court says another explanation could be that they only intended to start off with half a pound at this meeting, or a little more, and would later arrange to do the rest, perhaps after it was sold. Let's suppose that the transaction had been the reverse, that it was the undercover agents who brought the money, and it was these guys who had the stuff. Yes. And they had talked about a pound, and they show up with $4,600. Do you think a full pound would have been exchanged? No. I'm not sure. And the application note talks about that. And you're not sure. Well, I'm not sure, meaning I need to look at the application note 12, which talks about that wouldn't be the reverse sting. And in the reverse sting, the facts here talks about that the agreed-upon quantity controls unless the defendant proves otherwise. In that other situation, which would not be a reverse sting, then I think you go with the amount of drugs brought to the scene. But that's not the facts, unless I'm misunderstanding the Court. That's not the facts. Well, let's assume that the DEA agents, the undercover agents, actually have a pound. Okay. And the bad guys show up with $4,600, and the street price is $7,000. Do you think a full pound would have been exchanged? I think we look again at what the agreement was. And I think that ---- Oh, it's okay. You only brought half the amount necessary to buy a pound, but it's okay. We'll give you a pound. I don't think that would happen in ---- It defies logic, doesn't it? And in this case, the agent wasn't going to sit there and count out 211 bills at the scene. I mean, I think that was part of the ruse by the defendant was to bring this big wad of cash that made it look like they had the full 7,000 when they had enough to buy two-thirds of a pound. But that goes back, Your Honor, to what was the agreement. This was a conspiracy. Yeah. Let me ask you this. The guideline is phrased in terms of you look to the agreement unless. Right. Now, the district court said, I'm looking to the agreement. And did he make ---- he didn't really ---- he said, we can't know whether or not they had a ---- they had only the ability to pay for half a pound. I mean, it could have ---- And it was two-thirds of a pound, the amount of cash that they physically had on hand. We can't really know what they ---- What their intent was. We can't speculate. You're right, Your Honor. Okay. Now, what is the standard? What is our standard of review for determining whether or not the district court erred in failing to find the ---- Well, with regard to the methodology, it would be a de novo review. The methodology would be, with regard to the facts that support that methodology, that would be for clear error. And with regard to the purity, it would be the government's ---- the total amount would be the government's burden by preponderance. And so in this case, the Court looked at what were the negotiations, what was the agreement? One pound, clearly one pound, and beyond that, of high-quality crystal meth. The brother, when he first meets up, is complaining about the powder he's gotten before, and he says he wants crystal. He complains that his prior source gave him bad quality. And the defendant's brother says, I think that if we come in with, quote, damn good material, to which the agent replies that he will guarantee the quality of the product. So clearly, what they're looking for is high-quality crystal meth, one pound. They negotiate for $7,000. So the Court, in making its evaluation, took a look and said, well, let's see, what did they negotiate for? What was the agreement for? Not what at this one meeting, but what the agreement was for, because the defendant was developing a source of supply. You could argue there were going to be multiple meetings. Then look at what was the purity, high-quality meth. Then thirdly, the government submitted and the defendants stipulated to a listing of 19 purchases of methamphetamine made by the DEA during the same calendar year, 2005, the same geographical area, and those 19 purchases laid out the price, the purity, and the amount. Now, if you average those 19, which I did prior to coming to oral argument, it comes out to about 77 percent. So the Court was conservative and relied on evidence that had an indicia of reliability, the defendant's brother's negotiation, the defendant's words at the meeting. When the agent questions, this wad of money is pulled out, and the agent questions if the defendant says, no, we're going to work straight. Well, but I take it the real question, if we just narrow it down here, the real question is whether or not the district court erred in when it said, I'm going to look to the agreement, you don't, you don't, you haven't shown that he had a, only the ability to pay for half a pound. And I guess that's really almost a factual determination, isn't it? Yes, it would be, Your Honor, based on the transcripts and the negotiations. And what was the question? It's factual what the agreement was, but it's not factual whether or not he looks to the agreement instead of the amount of money that he could actually use. If he, if the, that, that is true. But the question is, he did look to whether or not he had the ability to pay, I take it. He did take a look at the ---- That's your position. Yes. Yes. And the Court looked at that, and in doing that, the Court said, you know, this doesn't outweigh everything else. The Court said, but the fact that the defense showed up with the 4,600-plus dollars does not seem to me to outweigh the other evidence that the agreement was for one or even two pounds, Your Honors. If you recall from reading the briefs, there was some discussion about it was always a minimum of one, but the agent was pushing for, why don't you take another one? And he said, well, I'd have to sell it. But the Court says this didn't negate the agreement was for one or two pounds. Based on the representations of the defendants, they wanted high quality. They were dissatisfied with their prior source. They usually sold two to three pounds per week. That's in the transactions in the taped phone, phone calls, Your Honors. And the information from the informant would be corroborative evidence. Based on all this, it seems to me that the agreement was for at least one pound of methamphetamine. And then based on that, the Court took a look at these figures submitted by the government and came up with a 60 percent figure. And, Your Honors, I would argue that even if this case were remanded, the result would still be a base offense level 34. That's what we're talking about. The Court found that the actual amount of meth was between the range, base offense level 34 is 150 to 500. So if you take the defendant's argument, and I'm not conceding anything here, but if the defendant's argument is, let's go with the cash that they brought on, that shows intent, that was enough to buy two-thirds of a pound. And doing the math, 474 grams is a pound. Two-thirds of a pound is 304 grams. It would only have to be 50 percent pure to be within that range of 150 to 50 percent. And if you take a look at the historical figures, the defendant who had been complaining that he couldn't sell this junk he'd been given by his prior supplier, he was surely looking for product that was better than 50 percent pure. Kagan. He was in business. Okay. And if you don't have any questions with regard to the first issue, the role in the offense, I would submit that, Your Honors. Any questions regarding the role? No. Thank you. Thank you. Thank you. When he's – when – it's all Salvador, right, who's talking about – my client's brother, who's talking about the quality and what he wants and how the stuff he's been getting is so stepped on he can't even sell it. So it's not necessarily that he's looking for, quote, high quality. He's looking for better than the terrible stuff that he's been getting. And when he says he wants crystal, it's instead of cocaine. He's being offered cocaine by the undercover cop, but he wants to – he wants to buy crystal. Not that crystal is the word for the super high quality that it sounded like the prosecutor was saying. But also, I know that the judge also said this, that it looked like they had enough money to buy two-thirds of a pound. But that's only if you go to Costco and you buy it in large quantity. If you're just buying it by the half pound, the price was $4,000 for a half pound, even though it's $7,000 if you buy a whole pound. So if they were – and the other piece of evidence that the judge did not consider was the difficulty that Salvador talked about multiple times in his hemming and hawing and the almost entrapment, quantity entrapment, that's going on with the undercover officer, which I want to point out is kind of the purpose for this application note, to avoid that, to allow the courts to account for that, that the – in reverse-ding situations, the undercover officers are trying to push larger quantities on these buyers. And when they show up, when they say repeatedly, we can't buy that much – That's right. That's right. All right. Thank you, Your Honors. Thank you. It's just argued it's submitted for decision.
judges: Schroeder, Canby, Hawkins